## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Darrell R. Matthews,**

        **Plaintiff,**

**v.**                           **Case No. 05-2552-JWL**

**Euronet Worldwide, Inc. and**
**PaySpot, Inc.,**

        **Defendants.**

### <u>MEMORANDUM & ORDER</u>

Plaintiff Darrell R. Matthews filed suit against defendants alleging that defendants terminated plaintiff's employment based on his race in violation of 42 U.S.C. § 1981. This matter is presently before the court on defendants' motion for summary judgment (doc. 73).[1] As will be explained, the motion is granted.

### I.    Facts

The following facts are uncontroverted or related in the light most favorable to plaintiff, the nonmoving party. Defendant Euronet Worldwide, Inc. ("Euronet") is an international company with offices in Europe, the United States and Asia. In the United States, Euronet is headquartered in Leawood, Kansas. Euronet provides Automated Teller Machine (ATM)

---

[1]Plaintiff has filed a motion for oral argument on defendants' motion for summary judgment (doc. 89). In light of the thorough record and exhaustive briefing provided by both parties, the court concludes that oral argument is unnecessary and would not aid the disposition of defendants' motion. The court, then, denies plaintiff's request. *See* D. Kan. R. 7.2.

outsourcing services to banks and operates an independent ATM network. Defendant PaySpot, Inc. is a subsidiary of Euronet. PaySpot sells pre-paid mobile phone minute services to merchants (primarily retailers), who in turn sell the pre-paid mobile phone minutes to consumers via terminals or machines located in the merchant's retail establishment. PaySpot's headquarters are located in Leawood, Kansas. Plaintiff Darrell Matthews is an African-American male who was employed by Euronet as a Human Resources Assistant from November 2004 through May 31, 2005. During this time frame, plaintiff worked under the supervision of Debbie Long, Euronet's Director of Global Human Resources. Ms. Long recruited and hired plaintiff.

Not long after he began his employment with Euronet, plaintiff learned that PaySpot planned to start a credit and collections department. Plaintiff, who had experience working in credit collections, advised Ms. Long that he desired to go back to work in collections and that he was exploring a collections position with PaySpot. Ms. Long, who was instrumental in the hiring of Cari Biehl, PaySpot's Manager of Credit and Collections, recommended to Ms. Biehl that she hire plaintiff and, ultimately, Ms. Biehl hired plaintiff as a Collections Representative in PaySpot's Credit and Collections Department. Plaintiff assumed his new position effective June 1, 2005.

As a Collections Representative, plaintiff's primary job responsibilities included obtaining credit reports (or processing credit checks) on prospective customers, reviewing the credit report and assigning a credit limit based on specific criteria; processing automated clearing house ("ACH") insufficient funds ("NSF") reports; working with customers to resolve delinquent accounts; and shutting down the terminals of delinquent customers. By way of

background, PaySpot's customers (typically retailers) maintained "terminals" or machines in their places of business that sold prepaid minutes for cellular phones. If, for example, a customer sold $50.00 worth of prepaid minutes on a particular day, that customer would then owe PaySpot $50.00, less whatever commission the customer was entitled to retain. The following day, then, PaySpot would "ACH" the customer for the $50.00 (essentially, the ACH program permitted an electronic transfer of funds from the customer's bank account to PaySpot's account). When an ACH debit was returned for insufficient funds, plaintiff was required to shut down that customer's terminal so that the customer could not continue to sell prepaid minutes (and accrue funds without PaySpot having the ability to access its portion of those funds) until payment had been made to PaySpot. After a customer's terminal had been shut down, it was plaintiff's responsibility to work with that customer and secure payment so that the terminal could be activated and the customer could resume selling prepaid minutes.

Defendants assert that plaintiff's job performance was deficient in numerous respects, including his failure to shut down terminals in a timely fashion and his failure to process credit checks in a timely fashion. In large part, plaintiff disputes that his performance was deficient. The evidence of both parties concerning plaintiff's performance will be explained and explored in more detail in connection with the parties' particular arguments on the motion for summary judgment. In any event, in late July 2005, after plaintiff had been employed by PaySpot for only seven weeks, Ms. Biehl terminated plaintiff's employment and she advised him that she was doing so based on his job performance.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Lifewise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).  An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id*. (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id*. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.  *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant. *Id.* (citing Fed.

4

R. Civ. P. 56(e)).  To accomplish this, sufficient evidence pertinent to the material issue  "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."  *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."  *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1); *see also Kaster v. Safeco Ins. Co. of Am.*, 2003 WL 22854633, at *2 (10th Cir. Dec. 3, 2003) (affirming the district court's grant of summary judgment in favor of defendant in an ADEA case where the plaintiff had failed to present evidence sufficient for a reasonable jury to conclude that Safeco's employment decisions were age-related); *Young v. White*, 2003 WL 21940941, at *1-2 (10th Cir. Aug. 14, 2003) (affirming district court's grant of summary judgment in favor of defendant in race discrimination and retaliation context).

## III.   Discussion

Plaintiff claims that defendants terminated his employment based on his race.  As plaintiff has no direct evidence of discrimination, his claim is analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Antonio v. Sygma Network, Inc.,* 458 F.3d 1177, 1181 (10th Cir. 2006).  Under the *McDonnell Douglas* framework, plaintiff has the initial burden of establishing a prima facie case of discrimination. *See id.*  If he establishes a prima facie case, the burden shifts to defendants to articulate a legitimate, nondiscriminatory reason for taking the adverse employment action.  *See id.*   If

defendants offer a legitimate, nondiscriminatory reason for their action, summary judgment against plaintiff is warranted unless he shows that there is a genuine issue of fact as to whether defendants' reason is pretextual. *See id.*; *Medina v. Income Support Div., State of New Mexico*, 413 F.3d 1131, 1136 (10th Cir. 2005).

Defendants move for summary judgment on plaintiff's discriminatory discharge claim, contending first that plaintiff cannot establish a prima facie case of discriminatory discharge. Defendants also contend that plaintiff cannot show that defendants' asserted legitimate, nondiscriminatory reasons for terminating plaintiff's employment are pretextual.[2] As explained more fully below, the court rejects defendants' argument concerning plaintiff's prima facie case but concludes that plaintiff has not shown a genuine issue of material fact as to whether defendants' proffered reasons for terminating plaintiff's employment are pretextual. The court, then, grants defendants' motion for summary judgment.

A.    *Same Actor Inference*

The threshold issue presented by defendants' motion is whether defendants are entitled to the "same actor inference" recognized by the Tenth Circuit in *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177 (10th Cir. 2006). In *Antonio*, the Circuit "announce[d] that in cases where 'the

_____

[2]As an alternative to their motion seeking summary judgment on plaintiff's claim in its entirety, defendants also move for summary judgment on a portion of plaintiff's claim for damages based on the doctrine of after-acquired evidence. In their reply, however, defendants have expressly withdrawn this aspect of their motion. The court, then, need not address this issue.

employee was hired and fired by the same person within a relatively short time span,' there is 'a strong inference that the employer's stated reason for acting against the employee is not pretextual.'" *Id.* at 1183 (quotations omitted).  As explained by the Circuit, when the same individuals who decide to hire a plaintiff, fully aware of the plaintiff's race, decide within a short time span to terminate that plaintiff's employment, it "makes little sense to deduce" that those individuals terminated the plaintiff's employment because of his or her race. *See id.*  In recognizing the "same actor inference," however, the Circuit emphasized that "the plaintiff still has the opportunity to present countervailing evidence of pretext" and that "'same actor' evidence gives rise to an inference, rather than a presumption, that no discriminatory animus motivated the employer's actions." *Id.* (quotations omitted).

Defendants contend that they are entitled to the "same actor inference" in this case, contending that Cari Biehl made the decision to hire plaintiff for the Collections Representative position and Ms. Biehl made the decision to terminate plaintiff's employment just seven weeks later.  The court declines to apply the "same actor inference" in analyzing defendants' motion for summary judgment.  Viewed in the light most favorable to plaintiff, the evidence reflects the existence of factual disputes concerning whether individuals other than Ms. Biehl played a role in the decision to hire plaintiff.

Plaintiff's evidence demonstrates that Debbie Long, Euronet's Director of Global Human Resources, played a significant role in the decision to hire plaintiff as a Collections Representative with PaySpot.  Ms. Long recommended plaintiff for the position to Ms. Biehl, who herself had only worked for PaySpot since April 1, 2005 and was hired in large part due to

7

the recommendation of Ms. Long.  A reasonable jury could conclude that Ms. Biehl, a newcomer herself who was hired due to Ms. Long's efforts, felt obligated to accept the recommendation of Ms. Long and acted solely on that recommendation in hiring plaintiff.  Indeed, Ms. Biehl did not interview any other candidates for the position and she admits that she did not review plaintiff's Euronet personnel file or any of his performance reviews prior to hiring plaintiff as a Collections Representative.  It is also uncontroverted that plaintiff did not submit a resume or job application for the position.  Moreover, it is undisputed that Ms. Biehl was the sole individual responsible for the decision to terminate plaintiff's employment.   In such circumstances, a jury could conclude that Ms. Biehl, despite any discriminatory animus she may have harbored against plaintiff, hired plaintiff based solely on the recommendation of Ms. Long and thereafter was motivated by a discriminatory animus when she alone decided to terminate plaintiff's employment.  Defendants, then, have not shown at this juncture that they are entitled to the benefit of the "same actor inference."

B.     *Plaintiff's Prima Facie Case*

In support of their motion for summary judgment, defendants contend that plaintiff cannot establish the second prong of his prima facie case of discriminatory discharge–a prong that requires plaintiff to show that he was qualified for his job.  *See Antonio*, 458 F.3d at 1183 n.3. According to defendants, plaintiff cannot establish that he was qualified for the Collections Representative position in the face of "overwhelming" evidence of certain deficiencies in plaintiff's job performance.  The court rejects this argument as defendants also assert that these

8

deficiencies in plaintiff's job performance were the reasons for their employment decision.[3] This court, relying on established Tenth Circuit precedent, has repeatedly declined to analyze an employer's assessment of the plaintiff's qualifications at the prima facie stage where the employer (like defendants here) also asserts that the plaintiff's alleged lack of qualifications was the employer's legitimate, nondiscriminatory reason for taking the adverse employment action. *See Goldstein v. Sprint/United Management Co.,* 2006 WL 2631948, at *7 (D. Kan. Sept. 13, 2006) (collecting cases and relying on *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1192-94 (10th Cir. 2000) and *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1316 n.11 (10th Cir. 1999)).  The court, then, will not require plaintiff, as part of his prima facie case, to disprove defendants' proffered reasons for terminating his employment.  Summary judgment on this issue is denied.

C.    *Plaintiff's Showing of Pretext*

As plaintiff has established a prima facie case for purposes of defendants' motion for summary judgment, the burden shifts to defendants to articulate a legitimate, nondiscriminatory reason for terminating plaintiff's employment.  According to defendants, they terminated plaintiff's employment based on certain deficiencies in plaintiff's job performance, including plaintiff's inability to "multi-task"; plaintiff's "slow" work; plaintiff's excessive socializing and

---

[3]Indeed, defendants, in their motion, address together the "qualified" prong of plaintiff's prima facie case and their legitimate, nondiscriminatory reasons, conceding that the two issues "overlap."

excessive cigarette breaks; and plaintiff's poor attendance.  With respect to plaintiff's alleged inability to multi-task and his "slow" work, defendants specifically assert that plaintiff failed to shut down in a timely fashion the terminals of those customers whose ACH debits had been returned for insufficient funds, failed to follow up with those customers in a timely fashion to secure payment and reactivate their terminals, and failed to process credit checks in a timely fashion.  Defendants further assert that plaintiff's alleged excessive socializing and cigarette breaks interfered with his work performance and contributed to his alleged failure to shut down terminals, follow up and process credit checks.

Plaintiff concedes that defendants have met their burden of production and, thus, the burden shifts back to plaintiff to demonstrate that defendants' proffered reasons are pretext.  *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006).  To show that an employer's proffered nondiscriminatory reason for an employment action is pretextual, "a plaintiff must produce evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Id.* at 1183 (quoting *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 490 (10th Cir. 2006)).

1.     Changing Explanations

In support of his pretext showing, plaintiff first contends that defendants' proffered

reasons have changed and expanded over time.  The Tenth Circuit has recognized that a jury can infer pretext when an employer, at the time of trial, offers a new reason for an adverse employment action that is unsupported by the documentary evidence.  *See Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 813 n.6 (10th Cir. 2000) (citing *Perfetti v. First Nat'l Bank of Chicago*, 950 F.2d 449, 456 (7th Cir. 1991) ("If at the time of the adverse employment decision the decision maker gave one reason, but at the time of trial gave another reason which was unsupported by the documentary evidence the jury could reasonably conclude that the new reason was a pretextual after-the-fact justification.")).  In *Tyler*, for example, the plaintiff , an African-American real estate agent whose application for a real estate franchise was denied, filed a section 1981 claim against the defendant and ultimately a jury returned a verdict in his favor. *See id.* at 811-12.  On appeal, the Circuit reviewed the record to determine whether the plaintiff had presented sufficient evidence to show that the defendant's asserted justifications for denying the plaintiff's applications were pretextual.  *See id.* at 812.  Although not pertinent to the Circuit's decision upholding the jury's verdict, the Circuit noted that it was "disquieted" by the fact that the defendant fully articulated its reasons for the first time months after the decision was made*. See id.* at 813.  Specifically, the defendant did not provide the plaintiff with its asserted seven reasons for denying his franchise application until more than 2 months after notifying plaintiff by telephone that his application had been denied. *See id.* at 811.  At trial, the same individual who had provided plaintiff with seven reasons for the defendant's denial testified that an additional reason factored into the denial.  With respect to this new reason, the Circuit, citing to the Seventh Circuit's case in *Perfetti,* stated that the jury "could reasonably conclude this was

11

a post hoc justification." *See id.* at 813 n.6.

*Perfetti*, in turn, acknowledged the principle cited in *Tyler*–that a new, after-the-fact justification provided at trial is sufficient for a jury to find pretext–but the Seventh Circuit ultimately concluded that the defendant in *Perfetti* had not raised a new justification for refusing to hire the plaintiff. 950 F.2d at 456. In that case, the plaintiff's ADEA failure-to-hire claims were submitted to a jury and the jury returned a verdict in favor of the plaintiff. *Id*. at 450. On appeal, the Seventh Circuit concluded that the plaintiff's pretext evidence was "insubstantial" and reversed and remanded for entry of judgment for the defendant. *Id*. With respect to one particular position for which the plaintiff had applied, the decisionmaker, after her interview with the plaintiff, made notes stating "Work experience appropriate. Consensus opinion was that other candidates had skill/experience/education packages that might be preferable." *Id*. at 454. When pressed for details at trial, the decisionmaker testified that the plaintiff did not have the interpersonal skills necessary for the position and that the plaintiff was not a "team player," an assessment made based on the plaintiff's "whole communication skills and demeanor throughout the interview" as well as a remark made by plaintiff during the interview concerning a disagreement he had with a former supervisor in which he insisted that the supervisor had been wrong. *Id*. at 455. Comparing the decisionmaker's initial notes concerning the reasons for the decision with her testimony at trial, the Circuit stated that she "did not bring up a new justification for refusing to hire [the plaintiff.] . . . . She simply elaborated on that justification at trial." *Id*. at 456.

In this case, the evidence viewed in the light most favorable to plaintiff reveals that

12

defendants, over time, have elaborated on the reasons that were initially provided to plaintiff for his termination but that defendants' stated reasons for plaintiff's termination have not changed over time.  Plaintiff testified that, at the time of his discharge, Ms. Biehl advised plaintiff that his employment was terminated because he had not been shutting down terminals in a timely fashion and she needed a more "multi-tasked employee."  Plaintiff's testimony is consistent with Ms. Long's recollection of what Ms. Biehl told her prior to the termination meeting concerning Ms. Biehl's reasons for plaintiff's termination.  That is, Ms. Long testified that Ms. Biehl advised her that she was terminating plaintiff's employment because he could not multi-task and he "works slowly."[4]  Curiously, Ms. Biehl herself testified that, consistent with her practice as a manager "not to give a reason at the time of termination," she was "unwilling" to provide to plaintiff a reason for his termination during the termination meeting because she is not required to do so under Kansas law and because doing so "tends to heat the terminations."  Even assuming that this evidence, rather than plaintiff's own testimony on the subject, is more favorable to plaintiff, it does not indicate that Ms. Biehl's reasons have changed over time, only that she elected not to share those reasons until some time after the termination itself.  While that fact might be troubling if no one had provided to plaintiff the reasons for his termination at the time of his termination, it is evident from plaintiff's own testimony that someone (presumably

_____

[4]Plaintiff contends that a factual issue is raised because Ms. Biehl recalled providing Ms. Long with two additional reasons for plaintiff's termination–his attendance and excessive personal phone calls–while Ms. Long did not recall those reasons.  Contrary to plaintiff's suggestion, the testimony of these witnesses is not "inconsistent," but merely reflects a difference in recollection over details that are not otherwise called into question.

Ms. Long if not Ms. Biehl) advised plaintiff at the time of his termination that his employment was being terminated due to his performance–namely, his failure to shut down terminals in a timely fashion and his inability to multi-task. In that regard, plaintiff testified that he confronted Ms. Biehl during the termination meeting about her failure to counsel plaintiff about any performance issues during his employment and that he could not understand Ms. Biehl's dissatisfaction with his performance.

According to plaintiff, Ms. Biehl's reasons have expanded over time in that defendants, in response to an interrogatory, identified numerous deficiencies in plaintiff's performance in addition to his alleged failure to multi-task and his failure to shut down terminals.[5] These additional deficiencies identified by defendants include failing to timely complete credit checks; working at a slow pace; working on tasks he wanted to do rather than tasks assigned to him; excessive breaks; unreliable attendance; excessive socializing (including personal phone calls and time spent talking with other employees); and failing to accept and act upon counseling. Ms. Biehl testified in her deposition that the items listed in response to the interrogatory were considered in connection with the termination of plaintiff's employment. Ms. Biehl also suggested in her deposition that there may have been additional reasons underlying the termination of plaintiff's employment not reflected in response to the interrogatory, stating that

---

[5] The interrogatory response expressly identified plaintiff's failure to multi-task as a deficiency in plaintiff's performance. While the response did not expressly state that plaintiff failed to shut down terminals, it did state that plaintiff "had difficulty keeping up with NSF ACHs." As the record reflects, plaintiff's primary responsibility in connection with the NSF ACH process was shutting down the terminals of customers who had ACH debits returned for insufficient funds.

she did not feel "comfortable" that the list was "complete." Regardless, no other reasons were ever identified by defendants.

A review of Ms. Biehl's deposition testimony reveals that each of the "additional" reasons identified in response to the interrogatory are simply part and parcel of what Ms. Biehl perceived as plaintiff's inability to multi-task and his failure to shut down terminals–the reasons initially provided to plaintiff in the termination meeting. For example, Ms. Biehl testified that, in her opinion, plaintiff's difficulties in the NSF ACH process (including failing to shut down terminals in a timely fashion and then failing to communicate with the customer in a timely fashion about activating the terminal again) stemmed in large part from plaintiff's desire to do other tasks that he preferred to do and from the fact that he was "away from his desk more than he was at his desk" because he was taking a cigarette break or talking with other employees. Similarly, Ms. Biehl testified that plaintiff's inability to multi-task resulted in plaintiff failing to complete his credit checks, because plaintiff was choosing to work only on tasks of his preference. Plaintiff, then, has not shown that Ms. Biehl's reasons have changed over time or that defendants have created "new" reasons during the litigation.

Plaintiff also contends that defendants' proffered reasons have changed over time because Ms. Long initially told plaintiff during the termination meeting that defendants were terminating his employment as a result of company-wide "cutbacks"–a reason that defendants have never again identified. Defendants concede that, during the same time frame when plaintiff's employment was terminated, defendants were terminating the employment of numerous employees in remote offices because those offices were closing down. Defendants deny ever

15

advising plaintiff that his termination was a result of those "cutbacks." Indeed, it is unclear from plaintiff's testimony whether he truly perceived that Ms. Long was telling him that his employment was being terminated as a result of cutbacks. In that regard, plaintiff testified that he asked Ms. Biehl to provide him a reason for his termination, at which point Ms. Long "interjected" as follows:

> You know about how we have to let people go down in Houston. We had to close, [sic] a lot of people losing their jobs there, and there's some people in California in Precept that are–that we're cutting back there, and you're not the only one. There's gonna be other people that are gonna be let go. And I'm sorry, you know.

At that point, according to plaintiff, Ms. Biehl explained to plaintiff that he had not been shutting down terminals and that she "was going with a more multi-tasked employee." Even plaintiff's own testimony, then, does not necessarily indicate that Ms. Long expressly advised him that his employment was being terminated due to cutbacks. In any event, even assuming that Ms. Long advised plaintiff that his employment was being terminated due to cutbacks, Ms. Long's statement is insufficient to permit an inference of pretext where it is undisputed that Ms. Biehl was the sole individual who decided to terminate plaintiff's employment and Ms. Biehl's stated reasons for doing so have remained consistent.


2.    Subjective Nature of Defendants' Proffered Reasons

Plaintiff also urges that pretext is shown because a number of defendant's proffered reasons are "subjective" in nature. The court disagrees. While at first blush defendants' reliance on plaintiff's "slow pace" and his inability to "multi-task" might suggest a subjective aspect, the

specific facts underlying these general descriptions reveal that both defendants' expectations and plaintiff's deficiencies in this regard were tied to objective criteria.  As explained earlier, defendants' criticism of plaintiff's "slow pace" focuses primarily on his failure to shut down terminals in a timely manner, his failure to communicate with the customer in a timely fashion about reactivating the terminal and his failure to process credit checks in a timely manner.  With respect to shutting down terminals, Ms. Biehl testified that plaintiff's responsibilities included sending an e-mail "first thing in the morning" to customer service directing customer service to lock down the terminals of those customers whose ACH debits had been returned for insufficient funds.  According to Ms. Biehl, plaintiff would not send the e-mails to shut down the terminals until "later in the day," thus permitting those customers to continue to sell prepaid minutes and accrue funds while exposing PaySpot to financial loss.  On the same day that a terminal was shut down or, at the latest, the following day, plaintiff was expected to follow up with the customer in an effort to secure payment so that the terminal could be reactivated as soon as possible (and, consequently, so that PaySpot could continue to earn money from the sale of prepaid minutes). Ms. Biehl testified that plaintiff repeatedly failed to address the needs of customers who were calling in an effort to make payment arrangements and to have their terminals reactivated.  As explained by Ms. Biehl, plaintiff's failure to follow up with customers was evidenced by "several pages" of NSF ACH returns logged on PaySpot's computer system–returns that would not have appeared on the log if plaintiff had made arrangements for payment with the customer and then simply clicked the "resubmit" button to resubmit the debit request.

Ms. Biehl testified that, like the processing of NSF ACHs, there is "an urgency" to the

processing of credit checks (so that PaySpot could set up terminals in new businesses) that plaintiff did not exhibit.  While the record is not entirely clear, it appears that plaintiff was expected to fax back to PaySpot's salespeople a credit report and assigned credit limit within days of receiving the request from sales.  As plaintiff testified, he and Ms. Biehl "were trying to calculate how many [credit checks] we had a day on a normal high peak day, how many it would take to get them done so we wouldn't get behind, and then on the slow day we calculated what could be done after we completed those."  Plaintiff testified that he and Ms. Biehl had a "general idea" of how long it would take under normal circumstances to complete credit checks. Despite discussions with plaintiff about the timely completion of credit checks, Ms. Biehl testified that she received phone calls from PaySpot's salespeople concerning plaintiff's failure to process those credit checks in a timely fashion.

Thus, defendants' assertion that plaintiff's "slow pace" factored into the discharge decision is not subjective; rather, in the specific context of this case, defendant's expectations with respect to plaintiff's performance were "articulated in guidelines with reasonable specificity."  *Bauer v. Bailar*, 647 F.2d 1037, 1046 (10th Cir. 1981).  For the same reasons, defendants' reliance on plaintiff's inability to multi-task, excessive breaks and excessive socializing are not subjective because those asserted reasons, as explained above, are simply variations on defendants' primary theme–i.e., plaintiff's inability to multi-task and his excessive breaks and socializing caused or contributed to his failure to shut down and reactivate terminals in a timely fashion and his failure to process credit checks in a timely fashion.  In sum, because defendants' proffered reasons for plaintiff's termination are tied to reasonably specific

18

performance guidelines, the court rejects plaintiff's contention that defendants' proffered reasons are subjective.

3.    Defendants' Failure to Follow Handbook Policy

According to plaintiff, pretext is also established by defendant's purported failure to follow its own policies that, according to plaintiff, require defendants to document performance problems and the reasons for an employee's termination.  Defendants contend that plaintiff's argument fails at the outset because defendants, in fact, documented plaintiff's performance problems.  Viewed in the light most favorable to plaintiff, however, the record supports plaintiff's assertion that defendants did not document his performance deficiencies.  The record contains one handwritten note to the file from Ms. Biehl concerning a discussion she had with plaintiff about his lengthy smoke breaks and lunch breaks as well as one note to the file regarding a discussion that Ms. Biehl had with plaintiff concerning the processing of NSF ACHs (a note that does not suggest that plaintiff was performing checks too slowly but only that she reviewed the entire process with him).  The evidence–again, viewed in the light most favorable to plaintiff–suggests that defendants never advised plaintiff about any attendance problems (while Ms. Biehl noted on her calendar the days when plaintiff was late or absent, the calendar entries were not shared with plaintiff and do not necessarily suggest that Ms. Biehl perceived an attendance problem); and never advised plaintiff about or documented any problems with "multi-tasking," "slow" work (except to the extent plaintiff admits that he had discussions with Ms. Biehl about the length of time it should take to complete a credit check), or excessive

19

socializing.[6]

In support of his argument that defendants failed to follow their own policies requiring documentation of performance problems, plaintiff relies on a multi-page document entitled "Euronet Worldwide Manager's Handbook" that bears a date of August 2002.[7]  Even assuming that the decisionmakers in this case were bound by the policies reflected in the Manager's Handbook,[8] defendants' failure to document plaintiff's performance problems and the reasons for plaintiff's termination do not permit an inference of pretext in this case.  Although the Manager's Handbook emphasizes the importance of appropriate documentation to support a disciplinary action (*e.g.*, "An effective discipline system requires appropriate documentation of all incidents in regards to employee conduct and performance."), the Handbook stops well short of "requiring" managers to document performance issues prior to termination.  For example, the Handbook states that an employee's personnel file "should" contain appropriate documentation prior to termination and the Handbook ultimately leaves the use of progressive discipline to the

_____

[6]Defendants' attempt to rely on documentation of plaintiff's performance problems while he worked at Euronet is unavailing, as there is no evidence that plaintiff's performance at Euronet played any part in the termination of plaintiff's PaySpot employment.

[7]It is undisputed that Euronet and PaySpot share the same Human Resources department such that documents concerning Human Resources' policies might be generated by Euronet but nonetheless utilized by PaySpot.

[8]Ms. Long testified that defendant's policies are expressed in the Employee Handbook and not the Manager's Handbook.  According to Ms. Long, the "Manager's Handbook" relied upon by plaintiff was developed and used only in 2002 in Little Rock, Arkansas as a tool to assist managers in the Little Rock office, a newly acquired subsidiary at that time.  Moreover, Ms. Biehl testified that she had not seen the Manager's Handbook at any time prior to her deposition.

discretion of defendants' managers ("Euronet may use progressive discipline at its discretion."). Plaintiff has offered no other evidence that defendants' managers believed that they were required to document all performance issues. In such circumstances, defendants' failure to document plaintiff's performance problems does not indicate that they acted contrary to company policy. *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1182 (10th Cir. 2006) (no inference of retaliatory motive arises from defendant's failure to utilize progressive discipline prior to terminating plaintiff; employee handbook made progressive discipline discretionary).

Moreover, while a discriminatory motive might be inferred from evidence that defendants consistently documented similar performance problems of other employees (and yet failed to document plaintiff's performance problems), plaintiff has identified no such employees and has come forward with no evidence suggesting that defendants applied the Handbook policies differently to him than it did to other employees. *See id.* ("Although a retaliatory motive could be inferred from a disparate application of handbook policies to similarly situated employees, Antonio identifies no such employees.").

4.    Reasons Generally Lack Credibility

Plaintiff asserts that pretext is established because each of the reasons asserted by defendants lack credibility. With respect to plaintiff's alleged inability to multi-task, plaintiff asserts that this reason lacks credibility because Ms. Biehl, in her deposition, could only recall one example of plaintiff's inability to multi-task: he did not answer his phone while doing paperwork. According to plaintiff, Ms. Biehl's conclusion is based only on the fact that she

could see plaintiff's desk from her office and, thus, knew that his phone rang unanswered on a daily basis. Plaintiff then comes forward with evidence from one of plaintiff's co-workers, Jerry Harris, who testified that Ms. Biehl could not see plaintiff's desk from her office; that she did not observe plaintiff's phone ringing unanswered "in any excessive amount"; and that plaintiff was able to multi-task.

A reading of the relevant portions of Ms. Biehl's deposition, however, reveals that her testimony concerning plaintiff's refusal to answer the phone while working on another task was based on what Ms. Biehl saw not from her own office, but from standing at plaintiff's cubicle observing his work.   For this reason, Ms. Harris's testimony concerning Ms. Biehl's ability to see plaintiff's desk from her office is not relevant in light of the fact that Ms. Biehl did not testify that she observed plaintiff from her office but rather from his own cubicle. Moreover, plaintiff's criticism that Ms. Biehl could recall only "one example" of plaintiff's inability to multi-task is not a fair representation of Ms. Biehl's testimony. As explained by Ms. Biehl, she observed "on a daily basis" plaintiff's inability to "switch over" from one task to another:

> If the phone rang, he would ignore it, because he could not, you know, have Word up and be [writing a letter] and then the phone ring and answer, it be [sic] a customer, and then switch over to the computer system to check whatever the customer needed on the phone. He was not taking the time to, you know, just pick up, switch–he couldn't switch from one thing to another very quickly. It was a constant "I'm doing just this and that's it."

According to Ms. Biehl, plaintiff, if he was working on another task, simply could not or would not answer the phone and "handle the customer."

Nor does Ms. Harris's testimony that she did not observe "plaintiff's phone ringing

unanswered in any excessive amount" create a factual issue.  Although in some circumstances a co-worker's assessment of a plaintiff's performance may be probative of pretext, *see Abuan v. Level 3 Communications, Inc*., 353 F.3d 1158, 1173-74 (10th Cir. 2003), Ms. Harris' conclusory assessment that she did not observe plaintiff's phone ringing unanswered in any excessive amount (without indicating what Ms. Harris deems "excessive" and without indicating whether plaintiff was sitting at his desk working on other tasks while the phone was ringing) is not sufficient to raise an inference of pretext in this case because the testimony does not cast doubt on  Ms. Biehl's testimony that she personally observed plaintiff fail to answer his phone on a daily basis.  Similarly, Ms. Harris's conclusory testimony that plaintiff "was able to multi-task" is of no consequence because it fails to address the specific observations made by Ms. Biehl–numerous instances where plaintiff was working on one task and ignored customer calls.

Plaintiff next challenges the veracity of defendants' criticism of the "slow" pace of plaintiff's work, a criticism that concerns two primary issues–the timely and efficient processing of credit checks and the processing of NSF reports, including shutting down the terminals of delinquent customers.  With respect to credit checks, plaintiff asserts that this reason lacks credence because Ms. Biehl could not "recall any particulars whatsoever regarding the allegation that [plaintiff] failed to complete credit checks in a timely manner."  The record, however, does not support plaintiff's contention.  Ms. Biehl testified that she received complaints from one of defendants' sales managers as well as various account managers that credit reports were not being completed quickly enough.  According to Ms. Biehl, she coached plaintiff on several occasions about getting credit reports completed and back out to the customer in a timely

manner. Indeed, plaintiff himself testified that he had discussions with Ms. Biehl about the length of time it took for him to complete credit checks.

With respect to completing the NSF ACH process, Ms. Biehl testified that plaintiff repeatedly failed to shut down in a timely fashion customer terminals once it was determined that the customer had insufficient funds in its account and that plaintiff failed to follow up with the customer once that customer's terminal had been shut down (*i.e.*, working on collecting payment from the customer and getting the terminal activated again). In an effort to establish pretext, plaintiff offers the testimony of Ms. Harris, his co-worker, who avers that she was "never aware of [plaintiff] having any issues regarding any failures on his behalf in shutting down [the] terminals" of defendants' customers. Ms. Harris's testimony does not raise a factual issue because there is no evidence that she would have been privy to information concerning plaintiff's success or failure in shutting down terminals. In other words, the mere fact that Ms. Harris was not aware of problems, without more, does not suggest that those problems did not exist. Plaintiff also complains that Ms. Biehl never counseled him about the NSF process. No inference of pretext arises from this fact in the absence of evidence that Ms. Biehl was required to provide such counseling or that she routinely counseled other employees about similar problems. *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1182 (10th Cir. 2006) (no inference of retaliatory motive arises from defendant's failure to utilize progressive discipline prior to terminating plaintiff where handbook made progressive discipline discretionary and plaintiff failed to identify similarly situated employees to which defendant applied handbook

24

policies differently).[9]

Plaintiff contends that defendants' reliance on plaintiff's "excessive socializing" as a reason for plaintiff's termination is pretextual because Ms. Biehl admits that she heard plaintiff have some conversations that were business-related and she admits that she did not hear every part of every conversation plaintiff had with other employees.  Ms. Biehl's testimony in this regard, however, fails to raise an inference of pretext for it does not show that Ms. Biehl did not honestly believe that plaintiff spent too much time talking with other employees (on any subject) as opposed to staying at his desk responding to the needs of customers in connection with the NSF process or processing credit checks.  Moreover, Ms. Biehl clearly testified that she overheard plaintiff engage in conversations of a personal (*i.e.*, non-business-related) nature on numerous occasions.

Plaintiff also contends that this reason lacks credibility because "everybody" socialized at the office.  Plaintiff's evidence, however, fails to show whether Ms. Biehl supervised these unidentified individuals who socialized at the office, whether Ms. Biehl knew that these individuals were socializing at the office, whether these individuals spent the same amount of time socializing as plaintiff or whether Ms. Biehl believed that the work performance of these individuals suffered as a result of time spent socializing. *See Doke v. PPG Indus., Inc*., 2003 WL 21355926, at *4 (D. Kan. June 10, 2003), *aff'd*, 2004 WL 2677688 (10th Cir. Nov. 24, 2004) (plaintiff's argument that he was "just doing what everyone else did" when he was terminated

---

[9]As explained *supra*, pp. 20-21, the use of progressive discipline was left to the discretion of PaySpot's managers.

for violating policy failed to show pretext; difference between plaintiff and "everyone else" is that plaintiff got caught; no evidence that management knew that others were violating policy and failed to do anything about it) (citing *Morrow v. Wal-Mart Stores, Inc.*, 152 F .3d 559, 562-63 (7th Cir. 1998) (in attempting to show disparate treatment through comparison to similarly situated employees, the relevant inquiry is whether management knew about the other employee's behavior); *Raleigh v. Snowbird Corp.*, 1999 WL 104439, at *2-3 (10th Cir. Mar. 2, 1999) (male plaintiff discharged for engaging in conduct allegedly amounting to sexual harassment failed to present evidence that any female employee accused of a work rule violation received different or more favorable treatment in the absence of evidence that a sexual harassment complaint was lodged against any of the other employees; plaintiff's argument that other employees engaged in the same kind of conduct that he engaged in simply "misses the point").  Plaintiff has not shown that this reason is pretextual.[10]

With respect to the issue of plaintiff's excessive cigarette breaks, plaintiff contends that the reason is pretextual because Ms. Biehl admitted that she had no personal knowledge regarding the amount of time plaintiff spent taking cigarette breaks.  Ms. Biehl's deposition testimony does not support this argument.  While Ms. Biehl testified, in response to questions about plaintiff's time sheets, that she did not know the "exact amount of time" that plaintiff spent taking cigarette breaks in the sense that she did not document the times that he took such breaks,

---

[10]To the extent plaintiff contends that the reason is pretextual because defendants never counseled him for it and never documented his socializing, that argument is rejected for the same reasons explained above. *See supra* p. 19-21.

her testimony clearly indicates that she had personal knowledge regarding the fact that plaintiff, in her opinion, took excessive cigarette breaks to the point that such breaks were interfering with plaintiff's work performance. While plaintiff disputes ever being counseled about his breaks, Ms. Biehl testified that it was a "continuing" issue in her mind and that she had been addressing it with plaintiff for some time before PaySpot's president, Tom Cregan, commented to her that he observed plaintiff taking excessive cigarette breaks.[11] Ms. Biehl also testified, in connection with describing plaintiff's failure to respond to customer needs, that plaintiff was "away from his desk more than he was at his desk on some days. Meaning he would be outside having a cigarette several times a day, or he would be at somebody else's desk talking."

Nor does the testimony of plaintiff's coworker, Ms. Harris, create a factual issue on this point. While Ms. Harris avers that she "did not observe any issues with [plaintiff] taking excessive breaks," her testimony (particularly in the absence of any indication of what Ms. Harris deems "excessive") does not refute that Ms. Biehl observed plaintiff taking what she perceived to be cigarette breaks that were too long and too frequent. Similarly, while she avers that Ms. Biehl and plaintiff's replacement took more frequent and longer cigarette breaks than

---

[11]Plaintiff argues that Mr. Cregan did not, in fact, complain to Ms. Biehl about plaintiff's cigarette breaks. The portion of the record to which plaintiff cites in support of this contention does not support the contention. Plaintiff cites to the deposition testimony of Mr. Cregan in which Mr. Cregan states only that he could not recall ever making any "particular complaints" to Ms. Biehl about plaintiff's "performance." In any event, even assuming Mr. Cregan does not recall complaining about plaintiff's cigarette breaks, that fact does not call into question Ms. Biehl's testimony that she believed that plaintiff's cigarette breaks were too lengthy and too frequent and that those breaks interfered with plaintiff's work performance.

plaintiff, those comparisons are not legally relevant because Ms. Biehl, as plaintiff's supervisor, is not similarly situated to plaintiff, *see Jones v. Denver Post Corp*., 203 F.3d 748, 752-53 (10th Cir. 2000) (Employee who was disciplined for using his employer's telephone for outside business could not show pretext by evidence that his supervisor used the telephone for outside business but was not disciplined; comparison was not legally relevant because nonsupervisory and supervisory employees "cannot be deemed similarly situated in a disciplinary matter such as this one."), and there is no evidence that Ms. Biehl believed that the cigarette breaks taken by plaintiff's replacement interfered with his job performance.

Finally, Ms. Biehl testified that she had concerns about plaintiff's attendance–namely, the number of days on which plaintiff either came into the office late or left the office early for "personal" reasons despite the fact that plaintiff did not have any available "personal leave" or accrued vacation time. Plaintiff contends that this reason is pretextual because his coworker, Ms. Harris, also came to work late and left the office early on occasions and yet no issues were raised with her. It is undisputed by plaintiff, however, that Ms. Harris, unlike plaintiff, had accrued personal time and vacation time that was available to her for those absences. Plaintiff also asserts that he always called ahead of time to advise Ms. Biehl that he was going to be late and that he always obtained Ms. Biehl's approval before leaving the office early. Regardless, this evidence does not call into question the undisputed fact that plaintiff did not have personal time or vacation time available to him (defendants do not contend that any time when plaintiff was absent from work due to illness factored into the discharge decision, as plaintiff had available sick time) and that Ms. Biehl was concerned about the frequency with which plaintiff took time

28

off for which he was not eligible.

For the foregoing reasons, plaintiff has not shown that defendants' proffered reasons lack credibility.

5.    Less Qualified Replacement

Finally, plaintiff contends that pretext is established because plaintiff's replacement (a Caucasian) had less experience in credit collections work than plaintiff.  The court rejects this argument as well.  While plaintiff's evidence shows that he had more years of experience in credit collections than his replacement, that evidence does not demonstrate that his replacement was so unqualified for the position as to support an inference of pretext.  *Compare MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1278 (10th Cir. 2005) (plaintiff's proffer of being more experienced than successful candidate insufficient to survive summary judgment; "[u]nless the disparity in employees' qualifications are obvious, 'we judges should be reluctant to substitute our views for those of the individuals charged with the evaluation duty by virtue of their own years of experience and expertise in the field in question.'") *with Abuan v. Level 3 Communications, Inc.*, 353 F.3d 1158, (10th Cir. 2003) (suggesting that inference of discrimination may arise if replacement was wholly unqualified for the position; evidence supported jury verdict in favor of plaintiff in part because plaintiff was replaced by someone who lacked the technical expertise required for the position such that plaintiff's former job duties had to be divided up among three other workers).

29

6.      Totality of Plaintiff's Pretext Evidence

While the court has addressed (and rejected) separately the pieces of circumstantial evidence that plaintiff claims demonstrate a pretextual explanation for his termination, the court's inquiry is not at an end.  The ultimate question on summary judgment for purposes of this case is whether plaintiff has presented sufficient evidence such that there is a genuine issue of material fact concerning whether plaintiff's race actually motivated defendants' decision to terminate plaintiff's employment.  This question "cannot be answered by looking at the plaintiff's evidence in a piecemeal manner."  *Voltz v. Coca-Cola Enterprises Inc*., 2004 WL 100507, at *9 (10th Cir. Jan. 22, 2004).  Rather, the court must consider whether plaintiff's evidence, taken as a whole, is sufficient to show pretext. *Simms v. Oklahoma ex rel. Dep't of Mental Health & Subs. Abuse Servs.*, 165 F.3d 1321, 1331 (10th Cir. 1999) (noting that the court, in pretext analysis, "must" consider circumstantial evidence in its totality).  Ultimately, the court concludes that the facts of this case, even viewed in the light most favorable to plaintiff, do not give rise to an inference of pretext.  For even considering the totality of plaintiff's evidence, that evidence does not demonstrate that defendants' asserted reasons for plaintiff's termination are "so weak, implausible, inconsistent, incoherent, or contradictory as to support a reasonable inference that [defendants] did not act for those reasons." *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1179 (10th Cir. 2006).  Stated another way, plaintiff's evidence is insufficient for a reasonable jury to find that defendants' proffered justifications were not the real reason for plaintiff's termination.  Plaintiff, then, has failed to meet his burden of demonstrating pretext and summary judgment in favor of defendants is warranted.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. 73) is granted and plaintiff's motion for oral argument (doc. 89) is denied.

**IT IS SO ORDERED.**

Dated this 9th day of February, 2007, at Kansas City, Kansas.

<u>s/ John W. Lungstrum</u>
John W. Lungstrum
United States District Judge